UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| CHIPPER PRO, LLC, *Plaintiff*, v. BANDIT INDUSTRIES, INC. and LESLIE EQUIPMENT CO., *Defendants*. | CASE NO. 3:21-cv-00049 MEMORANDUM OPINION & ORDER JUDGE NORMAN K. MOON |

This case is about woodchippers. Since 2013, Chipper Pro was the exclusive Virginia dealer of Bandit's wood-chipping equipment. But in 2020, its inventory of Bandit's equipment began to decline. Chipper Pro says that Bandit is largely to blame for the decline. It tried to make several purchases of equipment, but Bandit never had the right equipment in stock.

In early 2021, apparently concluding that it would sell more woodchippers in Virginia through another dealer, Bandit notified Chipper Pro of its intent terminate its status as Bandit's dealer for failing to maintain sufficient inventory. While the notice gave Chipper Pro sixty days to cure the alleged deficiencies, Chipper Pro argues that was not a good faith window to cure, but just window-dressing. Indeed, within thirty days Bandit already had contacted all of Chipper Pro's customers to tell them that Leslie Equipment Company was the new exclusive dealer of Bandit products in Virginia.

Several Virginia statutes include certain protections for equipment dealers before they can lose their equipment dealer status, namely, the Heavy Equipment Dealers Act and the Equipment Dealers Protection Act. Chipper Pro filed this suit against Bandit and Leslie, in which it asserts that Bandit violated those laws by unceremoniously replacing it as Bandit's

1

Virginia woodchipper dealer. The complaint includes other causes of action. As Chipper Pro's complaint contains factual allegations that, taken as true, state several plausible claims to relief, the Court will deny Bandit's motion to dismiss in large part, but grant it with respect to the civil conspiracy claim. The Court will grant Leslie's motion to dismiss. Chipper Pro's case therefore will proceed only against Bandit.

## Background

As this case is before the Court on a motion to dismiss, the Court must take the facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

Plaintiff Chipper Pro is a Virginia company that has sold Defendant Bandit's wood chipping equipment to customers in Virginia. Dkt. 24 ("Am. Compl.") at p.1. In 2013, Chipper Pro and Bandit entered into an agreement, by which Bandit would sell Chipper Pro its products for resale in Virginia. *Id.* ¶ 8. Chipper Pro acknowledges that "[t]here was never a complete, written [a]greement signed by Bandit and Chipper Pro setting forth the parties' contractual agreement." *Id.* ¶ 7. As part of their agreement, Bandit exclusively authorized Chipper Pro to be its dealer in Bandit products in Virginia. *Id.* ¶ 9. Bandit's representative, Chad Florian, stated that: "I [Florian] set Chipper Pro up in 2013 as the *exclusive* [B]andit whole tree chipper dealer for Virginia." *Id.* (emphasis added). Accordingly, pursuant to Chipper Pro and Bandit's "course of dealing, Chipper Pro was Bandit's exclusive dealer in Virginia from 2013 until Bandit terminated the Agreement." *Id.* Bandit had no Virginia market before entering this agreement with Chipper Pro. *Id.*

Chipper Pro alleges that it "made requests for inventory between January 2020 to January 2021 and were told by Bandit that Bandit had no inventory," and "did not have the specific items

requested in stock." *Id.* ¶ 11. Again in "late 2020," Chipper Pro "requested to purchase some items from Bandit to hold in stock and Bandit stated that it did not have any inventory to supply Chipper Pro." *Id.* ¶ 12.

On January 13, 2021, an agent for Bandit sent agents for Chipper Pro an email to discuss "dealership/territory changes that I am going to be making." *Id.* ¶ 13. Chipper Pro alleges that this email indicates "that at that point a decision to change dealers had already been made." *Id.*

On January 15, 2021, Bandit sent Chipper Pro a "90-Day Termination Notice and 60-Day Notice to Cure" under their agreement. *Id.* ¶ 14. The letter purported to be providing "90 days' statutory notice of termination of your [Chipper Pro's] status as a Bandit equipment dealer in the State of Virginia." Dkt. 24-1 ("Ex. A"). The letter also included a 60-day notice to cure the following issues:

> 1. Failure to maintain appropriate and expected levels of machine and parts inventory.
>
> 2. Failure to aggressively promote the sale of Bandit products.
>
> 3. Failure to submit orders to Bandit for products and inventory.

*Id.* The letter concluded that, "[i]f these matters are not cured, your status as a dealer for Bandit products is terminated effective April 15, 2021." *Id.*

Two of Bandit's agents met with John Leslie (the principal of Leslie Equipment) to discuss Leslie Equipment selling Bandit's products beginning in 2021. Am. Compl. ¶ 20. It is alleged on information and belief in the amended complaint that this meeting took place before Bandit's January 15, 2021, termination notice letter. *Id.* ¶ 59(g). It is further alleged in the amended complaint, "[o]n further information and belief, at this meeting these three individuals discussed Bandit's unlawful termination [of] the Agreement with Chipper Pro; replacing Chipper

3

Pro with Leslie becoming the exclusive Bandit dealer in Virginia, thus supplanting Chipper Pro, whose contract with Bandit was in force at the time of the meeting." *Id.*

On February 2, 2021, Bandit emailed John Leslie and other Leslie employees an "expansion mailer for [the] state of VA Large equipment expansion," which "would be sent out to all pulled data from Bandit of owners, prospects and competitive owners along with the past 5 years of EDA data on Horizontal Grinders, Whole Tree Chippers, and Shredders in the VA territory." Dkt. 24-9 at 2 ("Ex. F"). Bandit stated that once it confirmed the mailer with Leslie, it would be turned into "an email blast that bandit can send out on behalf of you [Leslie] as well as a one pager for you to utilize at dealer level." *Id.* The amended complaint also attaches the list of email addresses "to whom the blast would be sent, announcing that Leslie was replacing Chipper Pro as Bandit's Virginia Dealer." Am. Compl. ¶ 59(d).

Even though Bandit's termination letter purported to give Chipper Pro 60 days to cure those issues, Chipper Pro alleges that, within 30 days of the letter, "Bandit mailed, called and emailed all of Chipper Pro's customers" stating that Defendant Leslie Equipment Company was "the new exclusive dealer of Bandit products throughout Virginia." *Id.* ¶ 19. In 2021, Leslie began to sell Bandit heavy equipment in Virginia. *Id.* ¶ 21.

On March 26 and April 8, 2021, Chipper Pro, by counsel, sent Bandit two letters explaining that it was in compliance with their agreement and, in any event, had cured any non-compliance. *Id.* ¶ 17. In the letters, Chipper Pro contended that Bandit had acted unlawfully by contacting all of Chipper Pro's customers within the 60-day window to cure telling them that Leslie was Bandit's new dealer in Virginia. Dkt. 24-2 at 2 ("Ex. B"). On April 9, 2021, Bandit responded stating that its agreement with Chipper Pro would not be "reinstated." Am. Compl. ¶ 18 (citing Dkt. 24-4 at 2 ("Ex. D")).

4

On November 8, 2021, Chipper Pro filed suit against Bandit in Nelson County Circuit Court. Dkt. 1-1. Chipper Pro brought one count, a claim that Bandit had violated the Virginia Heavy Equipment Dealer Act ("HEDA"), Va. Code § 59.1-353, *et seq.* Bandit later removed the suit to this Court. Dkt. 1. Bandit also filed a demurrer (which this Court treated as a motion to dismiss the complaint), specifically on the ground that Chipper Pro had not adequately pleaded that it was a "dealer" pursuant to the HEDA. Dkt. 1-4. Following briefing on Bandit's motion to dismiss, the Court heard argument on the motion and found it appropriate to grant Chipper Pro's motion to amend its complaint. Dkt. 23.

Chipper Pro's amended complaint brought claims against Bandit and against the newly added Defendant Leslie Equipment Co. Dkt. 24. In the amended complaint, Chipper Pro brought four counts against Bandit. First, a claim that Bandit violated HEDA (including additional allegations and exhibits). Am. Compl. ¶¶ 22–41. Second, claim for violating the Equipment Dealers Protection Act ("EDPA"), Va. Code § 59.1-352.1, *et seq.* Am. Compl. ¶¶ 42–51. Third, a breach of contract claim. *Id.* ¶¶ 52–55. The fourth count is against Bandit and Leslie, for combining with another to injure another in its reputation, trade, business or profession, in violation of Va. Code §§ 18.2-499–500 (*i.e.*, civil conspiracy). Am. Compl. ¶¶ 56–62. Finally, Chipper Pro brought a fifth claim solely against Leslie for tortious interference with Chipper Pro's contract with Bandit. *Id.* ¶¶ 63–68.

In its amended complaint, and specifically in support of its HEDA claim, Chipper Pro added allegations and exhibits. Chipper Pro alleges that it "customarily maintained, during the entire period of time Chipper Pro was the only authorized Bandit dealer in Virginia, a total inventory, valued at over $250,000, of new heavy equipment and attachments and repair parts therefor." *Id.* ¶ 26. As a result, Chipper Pro alleges that it is a "heavy equipment dealer" and a "dealer" as defined by HEDA. In support of that contention, Chipper Pro attached to its amended

5

complaint charts and tables showing the purchases of equipment from Bandit and its value. One table shows the "[t]otal inventory of new heavy equipment and attachments" broken down by each month, starting from December 1, 2013, until January 1, 2021. Dkt. 24-6 ("Ex. E-2"). Adding these amounts and dividing by the number of months between December 2013 and January 2021, Chipper Pro's "average heavy equipment inventory maintained" was $662,014.55. *Id.* at 3.

Bandit has moved to dismiss Chipper Pro's amended complaint. Dkts. 29–30. The motion is fully briefed, Dkts. 35, 37, and the Court heard argument thereon on June 8, 2022. Leslie subsequently filed a motion to dismiss Chipper Pro's two counts against it (statutory civil conspiracy and tortious interference with contract). Dkts. 46 – 47. That motion has also been fully briefed. Dkts. 48 – 49. Both motions to dismiss the amended complaint are ripe for disposition.[1]

## Standard of Review

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King*, 825 F.3d at 214.

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "This standard does not require detailed factual allegations." *ACA Fin. Guar. Corp.*, 917 F.3d at 211 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, "[t]o meet the Rule 8 standard and 'survive a motion to dismiss, a complaint

---

[1] The Court considers the arguments and issues presented in Leslie's motion to dismiss were sufficiently covered by the parties' briefing and therefore do not necessitate oral argument on that motion.

must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor," *King*, 825 F.3d at 212. However, the Court need not "accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotes omitted).

Reasoning

1. *Virginia Heavy Equipment Dealers Act*

Bandit has moved to dismiss Chipper Pro's HEDA claim, arguing that it has failed to plead facts sufficient to establish that Chipper Pro is a "dealer" under the Act. Dkt. 30 at 2–5. The Court disagrees with Bandit. Chipper Pro has adequately pleaded that it is a "dealer" under HEDA to survive a motion to dismiss.

HEDA defines a "dealer" means a person in Virginia

(i) Engaged in the business of selling or leasing heavy equipment at retail,

(ii) *Who customarily maintains a total inventory, valued at over $250,000, of new heavy equipment and attachments and repair parts therefor*, and

(iii) Who provides repair services for the heavy equipment sold.

Va. Code § 59.1-353 (emphasis added).

Only the second element is in dispute—whether Chipper Pro sufficiently pleaded that it "customarily maintains a total inventory, valued at over $250,000, of new heavy equipment and attachments and repair parts therefor." Dkt. 30 at 3–5; Dkt. 35 at 3–7. Virginia state courts have

not addressed this provision. However, the Eastern District of Virginia has analyzed the requirement, concluding, in the context of HEDA, that "'customarily maintains a total inventory' requires that the dealer have $250,000 of inventory on hand or in stock on *a regular basis*." *Atl. Mach. & Equip., Inc. v. Tigercat Indus., Inc.*, 419 F. Supp. 2d 856, 861 (E.D. Va. 2006) (emphasis added). The court explained that "[c]ustomarily signifies a frequency which is more than occasionally but may be less than constant," but in any event the definition of "customarily" is "flexible and the outcome of the analysis under the Act will be factually dependent." *Id.* In that case, the court concluded that the party's total inventory "should be assessed on a monthly or quarterly basis," and with refence to "the total inventory during the years immediately preceding the date the Agreement was terminated." *Id.*

Bandit focuses on the latter months of the parties' relationship, noting that based upon Chipper Pro's own data, Chipper Pro did not have "any inventory in the year 2020" and that it did not have sufficient inventory for 18 months of their business relationship—which facts, Bandit contends, negate any allegation that it is a "dealer" under HEDA. Dkt. 35 at 3. Focusing on the three years preceding termination of their agreement, Bandit argues that sixteen of the thirty-six months show $0 in total inventory, and the other twenty months show $416,596.18 in total inventory—which Bandit contends, cannot meet the definition of customarily maintains" of over $250,000 of total inventory. *Id.* at 4.

The Court is unpersuaded that, as a matter of law, Chipper Pro has failed to allege facts sufficient to establish for purposes of a motion to dismiss that it was a "dealer" under HEDA. Indeed, there is no dispute that between December 2013 until January 2021, Chipper Pro maintained an average heavy equipment inventory of $662,014.55. Ex. E-2 at 3. That is well above the $250,000 threshold. Further, it appears that "Chipper Pro maintained the required inventory levels 80% of the time," over the parties' 86-month business relationship. Dkt. 35 at 4.

Those figures do a lot of the work to establish that Chipper Pro has adequately pleaded that it "customarily" had over $250,000 in total inventory, *i.e.*, "more than occasionally" but may be "less than constant." *See Atl. Mach. & Equip., Inc.*, 419 F. Supp. 2d at 861.

However, Bandit's argument is not without force that Chipper Pro's inventory levels from recent years should weigh more heavily in considering whether Chipper Pro "customarily" had over $250,000 in total inventory. *See* Dkt. 30 at 4–5; *Atl. Mach. & Equip., Inc.*, 419 F. Supp. 2d at 861 (explaining that the court would determine how much inventory "customarily" was maintained "by evaluating the total inventory during the years immediately preceding the date the Agreement was terminated"). To be sure, for a one-year stretch from January 2020 to 2021, Chipper Pro had no inventory. Ex. E-2 at 3. And before that (from June 2018 to January 2020), Chipper Pro maintained the same amount of inventory ($416,596.18) each month, which would tend to show no sales or purchases of Bandit equipment. *Id.* at 2–3. But HEDA's definition of "dealer" does not require a certain number of sales annually, or that a dealer hold a certain number of pieces of inventory, but rather that a dealer "maintain[ ] a total inventory, valued at over $250,000, of new heavy equipment and attachments and repair parts therefor." Va. Code § 59.1-353. And, as Bandit acknowledges, in the three years preceding Bandit's termination of the agreement, over half the time Chipper Pro maintained over $400,000 in inventory, well above the $250,000 limit. Ex. E-2 at 2–3.

Moreover, Chipper Pro has alleged that *Bandit effectively caused Chipper Pro's lack of inventory in 2020*, alleging that it "made requests for inventory between January 2020 to January 2021 and [was] told by Bandit that Bandit had no inventory" and "did not have the specific items requested in stock." Am. Compl. ¶ 11; *see also id.* ¶ 12 ("In late 2020, Chipper Pro requested to purchase some items from Bandit to hold in stock and Bandit stated it did not have any inventory to supply Chipper Pro."). These factual allegations counsel against relying too greatly on the last

9

12 months of Chipper Pro and Bandit's business relationship, for purposes of determining in this fact-dependent inquiry whether Chipper Pro "customarily" held over $250,000 in inventory, especially on a motion to dismiss. Indeed, HEDA's statutory scheme would be undermined if a supplier could render a dealer unable to invoke its protections by cutting off the regular sale of equipment. At bottom, while a complaint "does not need detailed factual allegations," *Twombly*, 550 U.S. at 555, here Chipper Pro included substantial, detailed factual allegations on this issue, supported by tables and evidence showing precise monthly inventory levels over multiple years, many of which were for well above the $250,000 floor.

On a motion to dismiss, Chipper Pro's allegations must be taken as true "and all reasonable inferences drawn in the plaintiff's favor," *King*, 825 F.3d at 212. At this early stage of litigation, the Court cannot agree, as a matter of law, Chipper Pro's allegations demonstrate that it did not "customarily" hold over $250,000 in total inventory. Chipper Pro's claim against Bandit under HEDA will proceed.

    2. *Virginia Equipment Dealers Protection Act*

Bandit has moved to dismiss Chipper Pro's claim under Virginia's Equipment Dealers Protection Act, or "EDPA." Dkt. 30 at 6–8.

First, Bandit argues that Chipper Pro has failed to sufficiently allege the existence of an "agreement" under EDPA. *Id.* at 6. EDPA defines an "agreement" as "a written or oral contract or agreement between a dealer and a wholesaler, manufacturer, or distributor by which the dealer is granted one or more of the following rights: 1. To sell or distribute goods or services. 2. To use a trade name, trademark, service mark, logo type, or advertising or other commercial symbol." Va. Code § 59.1-352.1.

Contrary to Bandit's argument, Chipper Pro has not failed to allege "facts to establish the existence of any written or oral contract" meeting the requirements of EDPA. *See* Dkt. 30 at 6.

While Chipper Pro acknowledged that there was no written contract setting forth the entirety of its contractual agreement with Bandit, under EDPA an agreement can be "a written *or oral contract or agreement* between a dealer and a … manufacturer." Va. Code § 59.1-352.1 (emphasis added). Moreover, under Virginia law, a party can accept an offer by performance, *Galloway Corp. v. S.B. Ballard Constr. Co.*, 464 S.E.2d 349, 356 (Va. 1995), and an "implied-in-fact" contract can arise where the elements of consideration and mutuality of assent are met, but the contract "is arrived at by a consideration of the parties' acts and conduct," *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 772 S.E.2d 290, 295 (Va. 2015). That is just what Chipper Pro alleged here: that it entered into an agreement with Bandit in 2013, by which Bandit agreed to sell its products to Chipper Pro for resale in Virginia. Am. Compl. ¶¶ 6–8. Chipper Pro also alleged that Chipper Pro was "Bandit's exclusive dealer in Virginia from 2013 until Bandit terminated the agreement." *Id.* ¶ 9. Chipper Pro alleged (and attached supporting evidence) that it bought millions of dollars of equipment from Bandit for resale in Virginia during this seven-year period. *See* Ex. E-1; Am. Compl. ¶¶ 9, 27. Indeed, in pre-litigation correspondence, Bandit itself cited its "Dealer Agreement" with Chipper Pro, of which, it asserted, Chipper Pro "is in breach …" Dkt. 24-4 at 1 ("Ex. D").[2] Chipper Pro's complaint contains sufficient allegations of an agreement within the meaning of the EDPA.

Bandit further contends that Chipper Pro has failed to allege that the termination of their agreement was "without good cause" under the EDPA. Dkt. 30 at 6–7. The EDPA provides that

---

[2] Indeed, Bandit's letter to Chipper Pro dated April 9, 2021, specifically cites "Section 5 of the Agreement" that Bandit explains "requires Chipper Pro to keep an 'inventory' of Bandit machines for sale and for demonstration to customers." Ex. D at 1. Presumably this line reflects a potion of an actual, written agreement between the parties that—for reasons unknown—neither party saw fit to bring to the Court's attention. In any event, this and other portions of the parties' correspondence only further renders plausible the existence of an agreement between the parties that meets the EDPA's definition.

"[n]o supplier … may terminate, cancel, fail to renew, or substantially change the competitive circumstances of an agreement without good cause." Va. Code § 59.1-352.3. The EDPA requires a supplier generally to provide a dealer a 90-day notice of termination and 60-day right to cure period, but "[t]he notice and right to cure [provision] is not required if the reason for termination, cancellation or nonrenewal is for good cause." *Id.* § 59.1-352.3(E). The Act further describes various circumstances in which good cause exists, including a bankruptcy petition being filed against the dealer, the dealer made a misrepresentation with intent to defraud the supplier, etc. *Id.* § 59.1-352.1.

Chipper Pro has alleged that Bandit terminated their agreement without good cause. Am. Compl. ¶ 47. Chipper Pro alleged that it was fulfilling its obligations under their agreement, *id.* ¶¶ 10, 46, but nonetheless, Bandit sought to make certain "dealership/territory changes," *id.* ¶ 13, reasonably indicating that a decision had already been made at that point to change to Leslie as the new, exclusive distributor of Bandit machinery, *id.* ¶¶ 13, 19, acting on that decision even before the end of the right to cure period, *id.* ¶¶ 19–21. Chipper Pro need not affirmatively allege facts in his complaint to preemptively disprove any purported basis for "good cause" that Bandit might—but has not yet—raised as a defense.

Bandit's argument that Chipper Pro "has not alleged facts to support the allegation that Bandit violated the EDPA's notice and right to cure requirements" is similarly unpersuasive. Dkt. 30 at 7. Chipper Pro alleged that "within *30 days* of [the] date of the Termination Notice, Bandit mailed, called and emailed all of Chipper Pro's customer's stating Leslie was the new exclusive dealer of Bandit products throughout Virginia …." Am. Compl. ¶ 19 (emphasis added). That is a specific, factual allegation—the truth of which must be accepted on a motion to dismiss. Chipper Pro has more than plausibly alleged that Bandit had failed to comply with the notice and right to cure provisions, and the date of Chipper Pro's response to Bandit (outside the

60-day right-to-cure period) does not negate the allegation that Bandit had not actually afforded Chipper Pro the right to cure within 60 days.

Finally, Bandit argues that Chipper Pro has not adequately pleaded that Bandit terminated their agreement based on "circumstances beyond Chipper Pro's control." Dkt. 30 at 8. The EDPA prohibits suppliers from terminating, canceling, or failing to renew or substantially changing the competitive circumstances of the retail agreement "based on the results of any circumstance beyond the dealer's control, including a natural disaster such as a sustained drought, high unemployment in the dealership market area, or a labor dispute." Va. Code § 59.1-352.9(4). While Chipper Pro cited this whole provision the amended complaint, Am. Compl. ¶ 49, the language of the statute prohibits a supplier from taking such actions "based on the results of any circumstances beyond the dealer's control," and what follow are examples of such circumstances, not an exhaustive list. And the allegations in the complaint elsewhere concerning the conduct underlying Bandit's decision to terminate Chipper Pro establish a plausible claim that Bandit terminated the agreement based on circumstances beyond Chipper Pro's control. *See, e.g.*, Am. Compl. ¶¶ 10–21, 34, 46–50.

Chipper Pro's claim under the EDPA survives Bandit's motion to dismiss.

3. *Breach of Contract*

Bandit's arguments that Chipper Pro has not stated a claim for breach of contract largely track its arguments whether Chipper Pro sufficiently pleaded an agreement under the EDPA. Dkt. 30 at 8–11. They are denied for the same reasons. The Court notes further that Chipper Pro has pleaded more than a mere "legal conclusion" by alleging that a term of their agreement was that Chipper Pro would be Bandit's exclusive distributor in Virginia. *See id.* at 9. Indeed, in the amended complaint, Chipper Pro includes factual allegations from Bandit's own representative acknowledging Chipper Pro's exclusive distributorship arrangement. Am. Compl. ¶ 9 ("As Chad

13

Florian, Bandit representative put it: 'I … set Chipper Pro up in 2013 as the exclusive [B]andit whole tree chipper dealer for Virginia"). Moreover, Chipper Pro has pled other facts to support this assertion, including the attached tables showing millions of dollars of equipment purchased from Bandit in the seven years of their business relationship. Am. Compl. ¶¶ 26–33 & Exs. E-2 – E-4. While Bandit argues that the statement that "one ex-employee allegedly told [Chipper Pro]" cannot alone support a claim for breach of contract, Dkt. 30 at 10, that line of argument prematurely seeks to introduce factual disputes beyond the pleadings. And, as stated above, even Bandit's own pre-litigation correspondence acknowledges the existence of a Dealer Agreement with Chipper Pro and faults them for failing to abide by that Agreement's terms. Chipper Pro has plausibly pleaded a breach of contract claim against Bandit.[3]

    4. *Civil Conspiracy*

Bandit and Leslie have moved to dismiss Chipper Pro's civil conspiracy claim under Virginia law. Dkt. 30 at 11–12; Dkt. 37 at 5–6; Dkt. 47 at 6–9; Dkt. 49 at 6–7.

Under Virginia Code § 18.2-500, "[a]ny person who [is] injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499"—Virginia's conspiracy statute—may seek relief in a civil court. In turn, Va. Code § 18.2-499 imposes liability on "[a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the

---

[3] The Court will not at this time issue any ruling on the potential application of the statute of frauds. The parties' arguments on the issue are vague and Bandit has not directly presented the issue to the Court for resolution. In its opening memorandum, Bandit notes that "Plaintiff has not attached any written contract to their Amended Complaint," and then writes in a small footnote that "[t]he lack of a written contract *may be decisive in this case* because Plaintiff's Amended Complaint alleges that this contract was to be performed for more than one year." Dkt. 30 at 9 & n.3 (emphasis added). Considering Bandit's cursory treatment of the issue, the Court will not address the potential application of the statute of frauds, without prejudice to Bandit's ability to raise the issue at a later appropriate time, if it so chooses.

purpose of … willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever."

To ultimately prevail under the Virginia conspiracy statute, a plaintiff must prove by clear and convincing evidence "(1) concerted action; (2) legal malice; and (3) causally related injury." *Schlegel v. Bank of Am., N.A.*, 505 F. Supp. 2d 321, 325 (W.D. Va. 2007) (citations omitted). "It is not necessary for a plaintiff to prove that the defendant conspirators acted with actual malice, *i.e.*, ill-will, hatred, or spite directed toward the plaintiff," but only that they acted with "legal malice, *i.e.*, intentionally, purposefully, and without lawful justification." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014). Further, "[a] plaintiff's allegations must establish that the defendants 'combined together to effect a preconceived plan and unity of design and purpose.'" *Borg v. Warren*, 545 F. Supp. 3d 291, 321 (E.D. Va. 2021) (quoting *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003)) (internal quotation marks and citation omitted). "Allegations of business conspiracy under § 18.2-499 are also subject to the heightened pleading requirements of Rule 9(b)," and "mere conclusory language" is insufficient. *Navient Sols., LLC v. Law Offices of Jeffrey Lohman*, No. 19-cv-461, 2020 WL 1644566, at *4 (E.D. Va. Apr. 2, 2020) (citing *Gov't Emps. Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 706 (E.D. Va. 2004)). In other words, "Virginia law requires a plaintiff to allege some details of time and place and the alleged effect of the conspiracy." *Borg*, 545 F. Supp. 3d at 321 (quoting *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007)).

Even taking all the facts in Chipper Pro's complaint as true and affording all reasonable inferences in its favor, Chipper Pro has not alleged facts that would establish that Bandit and Leslie "combined together to effect a preconceived plan and unity of design and purpose" and did so with legal malice, *i.e.*, that they "acted intentionally, purposefully," and—significantly—

"without lawful justification." *Adv. Marine Enters., Inc. v. PRC Inc.*, 501 S.E.2d 148, 154–55 (Va. 1998).

The amended complaint includes no non-conclusory allegations of fact that Leslie did anything "without lawful justification," vis-à-vis Chipper Pro, rather than simply sought and secured a new business relationship with Bandit. The very most Chipper Pro can say is that it has alleged that Leslie and Bandit met before Chipper Pro's agreement with Bandit concluded. *See* Am. Compl. ¶ 59(g). But any allegations of wrongdoing by Leslie are conclusory and devoid of factual enhancement, and thus not entitled to a presumption of truth. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3dd 250, 255 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678)). Nor do any other allegations in the amended complaint—including those about the email from Bandit reflecting that a mailer would go out describing Leslie's status as dealer of Bandit machinery—work to supply the necessary factual predicate that would, taken as true, establish that Leslie acted without lawful justification. Similarly, the amended complaint lacks any nonconclusory allegations of fact that would show that Leslie and Bandit "combined together to effect a preconceived plan and unity of design and purpose," *Borg*, 545 F. Supp. 3d at 321, specifically, one that would, without lawful justification, break Bandit's preexisting contract with Chipper Pro and have Leslie take its place as dealer of Bandit products in Virginia. Much less are there such allegations as would satisfy Rule 9(b)'s heightened pleading requirements. *See AWP, Inc. v. Commonwealth Excavating, Inc.*, No. 5:13-cv-31, 2013 WL 3830500, at *3 (W.D. Va. July 24, 2013) ("The circumstances to be pled with particularity under Rule 9(b) are … the time, place and contents of the false representations, as well as the identity of the person

making the misrepresentation and what he obtained thereby.") (cleaned up).[4] Chipper Pro's civil conspiracy claim against Bandit and Leslie will be dismissed.

    5.  *Tortious Interference with Contract*

Finally, Leslie has moved to dismiss Chipper Pro's tortious interference with contract claim brought solely against Leslie. Dkt. 47 at 5–6; Dkt. 49 at 3–6; Am. Compl. ¶¶ 63–68. The elements of a tortious interference with contract claim in Virginia are "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). Thus, an "interferor's knowledge of the business relationship and [its] intent to disturb it are requisite elements." *Id.* at 102–03. Here, Chipper Pro's complaint has failed to include non-conclusory allegations of fact that, taken as true, would establish either. It is fair to say that Leslie was awarded a contract to be Bandit's new dealer, and that Chipper Pro was the prior dealer. *See* Am. Compl. ¶¶ 63–69; *see also id.* ¶¶ 19–21, 59. And that Bandit and Leslie met. *Id.* ¶¶ 20, 59(g). But any allegations that Bandit moved to terminate its dealer agreement without fulfilling the statutory requirements to do so (which claims proceed against Bandit), allege conduct by Bandit, not Leslie. *See* Am. Compl. ¶¶ 14–21. In short, the allegations Chipper Pro included to claim *Leslie intentionally interfered with or induced a breach* in Bandit's contract

---

[4] The facts underlying the business conspiracy claim cases that Chipper Pro has cited reflect detailed, preconceived plans between the defendants, which, if anything, only serve to highlight the paucity of allegations present here. *See, e.g.*, *Adv. Marine Enters., Inc.*, 501 S.E.2d at 112–14, 117; *Comm'l Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 265 (Va. 1995) (describing payments of "bribes" and "kickbacks" paid by new contractor who ultimately was awarded work over incumbent contractor plaintiff).

with Chipper Pro are based on nothing more than conclusions and conjecture, which do not suffice for this claim to proceed further against Leslie. *See Iqbal*, 556 U.S. at 679 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

Accordingly, Chipper Pro's tortious interference with contract claim against Leslie will also be dismissed.

## Conclusion

For these reasons, the Court concludes that Bandit's motion to dismiss Chipper Pro's amended complaint will be **GRANTED in part** (as to Chipper Pro's civil conspiracy claim) and **DENIED in part** (as to Chipper Pro's HEDA, EDPA, and breach of contract claims). Dkt. 29.

The Court also concludes that Leslie's motion to dismiss will be **GRANTED**. Dkt. 46. Accordingly, the Court directs the Clerk of Court to dismiss Leslie as an active party from this case.

It is so **ORDERED**.

The Clerk of Court is directed to send this Memorandum Opinion and Order to the parties.

ENTERED this  21st  day of July, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE